1

2

3

4

5

6

7

8          # UNITED STATES DISTRICT COURT

9                EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  LUISA ALVAREZ, | Case No.  1:15-cv-01708-SAB |
| 12          Plaintiff, | ORDER AFFIRMING IN PART AND DENYING IN PART PLAINTIFF'S APPEAL |
| 13       v. | AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR |
| 14  COMMISSIONER OF SOCIAL SECURITY, | SUMMARY JUDGMENT AND REMANDING APPEAL FOR FURTHER ADMINISTRATIVE PROCEEDINGS |
| 15          Defendant. | |
| 16 | (ECF Nos. 14, 17, 18) |

17

18

19                              **I.**

20                      **INTRODUCTION**

21      Plaintiff Luisa Alvarez ("Plaintiff") seeks judicial review of a final decision of the

22  Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for

23  disability benefits pursuant to the Social Security Act.  The matter is currently before the Court

24  on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley

25  A. Boone.[1]

26      Plaintiff suffers from depressive disorder, headaches, gastritis, alleged vision problems,

27  multi-level degenerative disc disease, and history of neck sarcoma.  For the reasons set forth

28  _____

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 8, 10.)

below, Plaintiff's Social Security appeal shall be affirmed in part and remanded for further administrative proceedings.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on October 28, 2011.  (AR 77.)  Plaintiff's application was initially denied on May 15, 2012, and denied upon reconsideration on January 4, 2013.  (AR 158-62, 165-169.)  Plaintiff requested and received a hearing before Administrative Law Judge Danny Pittman ("the ALJ").  Plaintiff appeared for a hearing on January 14, 2014.  (AR 36-76.)  On June 27, 2014, the ALJ found that Plaintiff was not disabled.  (AR 11-27.)  The Appeals Council denied Plaintiff's request for review on September 4, 2015.  (AR 1-3.)

### A.    Hearing Testimony

Plaintiff testified at the January 14, 2014 hearing with the assistance of a Spanish language interpreter.  (AR 39-63, 65-66.)  Plaintiff was born on April 4, 1965.  (AR 39.)  She was 5 foot 4 inches tall and weighed 175 pounds on the date of the hearing.  (AR 39.)  Plaintiff is right handed.  (AR 39.)

Plaintiff is married and has three children ages 20, 15, and 11.  (AR 39.)  The minor children live with Plaintiff.  (AR 39.)  Plaintiff lives in a house with her son, mother and husband.  (AR 40.)  Plaintiff's husband is retired.  (AR 40.)  Plaintiff has a driver's license and drives three to four times a week to doctor's appointments and to her children's school.  (AR 40.)  Plaintiff completed the seventh grade in Mexico.  (AR 41.)  Plaintiff is able to read Spanish.  (AR 41.)  She is able to read, write, and speak very little English.  (AR 41, 61.)

Plaintiff worked at Honey Baked Hams but has had a lot of jobs and did not remember what she did for them.  (AR 43-44.)  Plaintiff worked seasonally fulltime sorting tomatoes and almonds.  (AR 44.)  When she worked as a nut sorter she was able to sit or stand.  (AR 65-66.)  She also worked fulltime putting doors together.  (AR 44.)  The company closed when the economy took a down turn.  (AR 44.)  Plaintiff worked at Gallo Winery in 2008.  (AR 45.)  In her job at the winery, Plaintiff would complete reports.  (AR 41.)  She would count the trucks

1  that came in and put stickers on the trucks.  (AR 41.)  The reports would be in English, but the

2  supervisor would write them for her.  (AR 42.)  Plaintiff also completed function reports in

3  English for her disability claim, but stated that the supervisor filled them out for her and she just

4  copied them.  (AR 42.)  Plaintiff also worked providing home support services.  (AR 45.)  She

5  provided companionship to a man.  (AR 45.)  Plaintiff did not do any heavy work, but the job

6  involved giving medication, "combing" him, and reading to him.  (AR 45-46.)

7  Plaintiff does volunteer work at her church.  (AR 43.)  Plaintiff will go out and talk to the

8  homeless people.  (AR 43.)

9  After rehabilitation from her cancer surgery, Plaintiff had an accident and she has neck

10  and back pain and her hands and arms swell up.  (AR 46.)  Plaintiff filed a lawsuit regarding the

11  motor vehicle accident to get her medical bills paid.  (AR 46.)  Plaintiff received $4,000.00 from

12  the lawsuit.  (AR 46.)

13  Plaintiff's medication has been increased.  (AR 47.)  The pain medications control her

14  pain "a little bit" but then it comes back.  (AR 47.)  Plaintiff is also taking medication for her

15  depression.  (AR 47.)  It helps a little but she is very depressed because of her small children.

16  (AR 47.)  She wants to help her children advance.  (AR 47.)  Her son was studying for

17  criminology but he had to leave school to help her so that she could have medical attention.  (AR

18  47.)  Plaintiff had cancer surgery two years ago because they found some cancerous tumors.

19  (AR 48.)

20  Sometimes her face swells up in the area that she had her cancer surgery.  (AR 48.)  The

21  doctors want Plaintiff to have surgery on her back, but she has not had it because she does not

22  have insurance.  (AR 48.)  Plaintiff applied under the Affordable Care Act and was denied.  (AR

23  48.)  They told her to apply for Medi-Cal but they turned her down also.  (AR 48.)  The doctors

24  said that surgery on her neck might help a little bit for the pain, but it could leave her as a

25  vegetable and that she would not be able to turn her neck much to the side.  (AR 62.)  Sometimes

26  Plaintiff feels as if her neck is so heavy it is putting too much pressure on her shoulders.  (AR

27  62.)  It takes about an hour for Plaintiff to feel that way and then she will lie down on a massage

28  pillow.  (AR 62.)  This occurs about four or five times per day.  (AR 62.)  About six times per

day, Plaintiff will move and have dizziness.  (AR 62-63.)  Plaintiff fell twice the day before the hearing and bruised her right forearm.  (AR 63.)  Plaintiff will pinch herself to see if she can feel anything because her arms are numb and leaves marks on herself.  (AR 63.)

Plaintiff did receive injections in her back at Stanford that helped her for about two weeks.  (AR 48-49.)  Plaintiff's doctor recommended physical therapy but she cannot afford it because she does not have insurance.  (AR 49.)  Plaintiff does wear a belt for her back, a brace for her back, and patches for pain.  (AR 49.)  The brace helps at times but she sometimes gets swelling in her back.  (AR 49.)  Plaintiff uses a cane that was recommended by a doctor after her accident.  (AR 49.)  She has been using the cane all day long since she had the accident.  (AR 49.)  Plaintiff's arm falls asleep a lot.  (AR 49-50.)  Plaintiff would like to see a doctor for her mental health issues but does not have insurance.  (AR 50.)

Plaintiff has constant pain from her neck to her waist, sometimes it is less because of the medication, but it always comes back.  (AR 50.)  Sometimes she is unable to sleep because the pain is so bad.  (AR 50.)  Her legs go numb a lot and her feet swell.  (AR 50.)  Moving her arms helps the pain and her sons will massage her.  (AR 51.)  Plaintiff's pain is worse with a lot of movement or if she sits or walks too long.  (AR 51.)  Plaintiff can sit for about 20 minutes before needing to stand up.  (AR 51.)  She can stand for about 15 minutes.  (AR 51.)  Plaintiff can walk around the block slowly, starting and stopping.  (AR 51.)  Plaintiff can lift 10 pounds.  (AR 52.)  Plaintiff has problems with both arms since her surgery, but her right arm is worse.  (AR 52.)  Plaintiff cannot lift her arm overhead.  (AR 52.)  She can lift the right arm in front of her slowly.  (AR 52.)  But her right hand goes numb and she drops things.  (AR 53.)  Plaintiff is unable to bend over to pick something up if she drops it.  (AR 53.)  Plaintiff is able to button or zip things and can use a pen or pencil to write but it takes her some time.  (AR 53.)  Plaintiff does dishes with her left hand and only moves her right hand a little bit.  (AR 63.)

Since her surgery, Plaintiff's right eye is very cloudy.  (AR 53.)  Sometimes when she is in pain she has difficulty remembering recent things.  (AR 54.)  Plaintiff has difficulty concentrating and gets dizzy when she tries to concentrate.  (AR 54.)  Sometimes Plaintiff has difficulty making decisions.  (AR 54.)  When she tries to make a decision she gets dizzy.  (AR

54.)  Plaintiff does not have problems getting along with people.  (AR 54.)

On a typical day, Plaintiff will talk with her mother, and sleep for about 20 to 30 minutes.  (AR 55.)  She has trouble sleeping at night and only sleeps for two to three hours.  (AR 55.)  Plaintiff needs help if she has to tie her shoes and with her hair because she cannot lift her arm very much.  (AR 55-56.)  Plaintiff does not cook, but she does the dishes.  (AR 56.)  She does not vacuum, mop, sweep or do laundry.  (AR 56.)  Plaintiff uses the hose to water outside.  (AR 57.)  She cleans around the house with water.  (AR 57.)  Plaintiff goes grocery shopping and to church.  (AR 57.)  Plaintiff is able to follow the sermon at church.  (AR 57.)  Plaintiff tells her children when the bills needs to be paid and helps them with paying the bills.  (AR 57.)

Plaintiff has friends and they go to the movies, but usually they rent movies at home.  (AR 57.)  They spend a lot of time with the children and her mother.  (AR 57.)  Plaintiff sometimes goes out to restaurants.  (AR 57.)  Plaintiff attends her son's basketball, baseball and football games.  (AR 58.)  Plaintiff goes to the mall and walks a while and then she will sit and wait for her children to do their shopping.  (AR 58.)  Plaintiff is starting to learn how to use the computer.  (AR 58.)  Plaintiff uses Facebook and plays games.  (AR 58.)  Plaintiff enjoys reading, but when her eyes get tired she stops.  (AR 58.)  Plaintiff has birds and she and her family take care of them.  (AR 58.)

Plaintiff was cleared as a foster home in 2011 but does not currently have a foster child.  (AR 59.)  Plaintiff had been a foster parent for 16 years but when she had cancer surgery she took a break for a year.  (AR 59.)  Plaintiff had a five year old foster child until four days prior to the hearing.  (AR 60.)  Plaintiff helped the child to get dressed.  (AR 60.)  The child was like another member of the family.  (AR 60-61.)  They are looking for a child to adopt.  (AR 60.)

A vocational expert ("VE"), Judith L. Najarian, also testified at the hearing.  (AR 64-75.)  The VE characterized Plaintiff's past work history as a nut sorter, Dictionary of Occupational Titles ("DOT") 521.687-086, sedentary, SVP 2; sorter, agricultural produce, DOT 529.687-186, light, SVP 2; door assembler I, DOT 762.684-034, medium, SVP 3; foster parent, DOT 309.677-014, light, SVP 3; inspector-grader, agricultural establishment, DOT 409.687-010, light, SVP 2.  (AR 65-67.)

1    The ALJ proffered a hypothetical of an individual of Plaintiff's age, education, and past

2    work experience who is limited to occasionally lifting and carrying 50 pounds and frequently 25

3    pounds; standing and/or walking 6 hours and sitting for 6 to 8 hours in an 8 hour workday;

4    frequent balancing, stooping, kneeling, crouching, crawling, and climbing; occasional overhead

5    reaching with the upper right extremity; and able to perform frequent manipulative activities

6    with the upper right extremity.  (AR 67.)  The VE opined that this individual would be able to

7    perform Plaintiff's past work as a foster parent, inspector, door assembly, and nut sorting.  (AR

8    68.)  The only past job she would not be able to perform is the tomato sorter.  (AR 68-69.)  She

9    would also be able to work as a machine feeder, DOT 699.686-010, medium, SVP, with a

10   twenty-five percent reduction for the hand limitation there would be 2, 217 jobs in California and

11   9 times that amount in the United States.  (AR 69.)  The individual would also be able to work as

12   a carton forming machine operator, DOT 641.685-022, medium, SVP 2, with a twenty percent

13   reduction for the hand limitation there would be 7,959 jobs in California and 9 times that many

14   in the United States.  (AR 69-70.)  A third job would be a package sealer, DOT 920.685-074,

15   medium, SVP 2, with a twenty-five percent reduction for the hand limitation there would be

16   4,222 jobs in California.  (AR 70.)

17   The ALJ proffered a second hypothetical of the same individual who is limited to

18   occasionally lifting and carrying 20 pounds and frequently 10 pounds; standing and/or walking

19   for 6 hours; sitting for 6-8 hours in an 8 hour day; frequent pushing and pulling and occasional

20   overhead reaching with the right upper extremity; frequent balancing, stooping, crouching, and

21   occasional crawling and climbing.  (AR 70.)  The VE opined that this individual would be able

22   to perform the job of nut sorter and foster parent as Plaintiff described it.  (AR 71.)  This

23   individual would also be able to work as a bottle-line attendant, DOT 920.687-042, light, SVP 1.

24   (AR 71.)  With a fifty percent reduction for the hand limitation there would be 23,003 jobs in

25   California; vacuum-bottle assembler, DOT 739.687-194, light, SVP 1, with a sixty percent

26   reduction there would be 8,759 jobs in California; and a box sealing inspector, DOT 641.687-

27   014, light, SVP 2, with a twenty-five percent reduction there would be 11,439 jobs in California.

28   (AR 71-72.)

1    The ALJ proffered a third hypothetical of this same individual who is limited to

2  occasional lifting and carrying of 10 pounds and frequently less than 10 pounds; standing and or

3  walking for 2 hours and sitting for 6 to 8 hours in an 8 hour day; occasional balancing, stooping,

4  kneeling, crouching, crawling, and climbing; frequent pushing and pulling; and occasional

5  overhead reaching with the right upper extremity. (AR 72.)  The VE opined that this individual

6  would be able to perform Plaintiff's past work as a nut sorter. (AR 72.)  This individual would

7  also be able to work as a hand bander, DOT 920.687-030, sedentary, SVP 2, with 3,173 jobs in

8  California; compact assembler, DOT 739.687-066, sedentary, SVP 2, with 2812 jobs in

9  California; and table worker, DOT 739.687-182, sedentary, SVP, with 1,582 jobs in California.

10  (AR 73.)   If occasional manipulative activities were included in the hypothetical it would

11  eliminate all work. (AR 73.)

12    The ALJ asked the VE about the handling requirements for the job of nut sorter.  The

13  DOT states that the job has frequent handling and fingering. (AR 73.)  The VE opined that this

14  was not reasonable. (AR 73.)  About a year prior, the ALJ did a job analysis at a pistachio plant

15  just south of town. (AR 74.)  They did have seating and could sit and stand as they wanted. (AR

16  74)  The job required constant fingering and handling. (AR 74.)

17    The ALJ presented a fourth hypothetical of the same individual who was limited to

18  occasional lifting and carrying of 10 pounds and frequently less than 10 pounds; standing and or

19  walking for less than 1 hour and sitting for less than 1 hour in an 8 hour day. (AR 74.)  The VE

20  opined that there would be no jobs that this individual could perform. (AR 74.)  Similarly if the

21  additional limitation were made to the first three hypotheticals that the individual would miss

22  two or more days of work per month there would be no work the individual could perform. (AR

23  74.) (AR 74.)

24    Plaintiff's counsel proffered the first hypothetical with the additional limitation of

25  occasional reaching, handling, and fingering with the right dominant upper extremity, and no

26  more than frequent with the left in all directions, and a non-English speaker. (AR 75.)  The VE

27  opined that there would be no jobs available for that individual. (AR 75.)

28

**B.      ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2013.

- Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of November 1, 2008 through her date last insured of December 31, 2013.

- Through the date last insured, Plaintiff had the following severe impairments: multi-level degenerative disc disease and history of neck sarcoma.

- Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments through the date last insured.

- Through the date last insured, Plaintiff had the residual functional capacity to lift and carry 20 pounds occasionally, 10 pounds frequently, stand and walk 6 hours cumulatively, and sit 6 to 8 hours total in an 8-hour workday.  She was limited to frequent pushing and pulling and occasional overhead reaching with the right upper extremity. Lastly, she was limited to frequent balancing, stooping, kneeling, crouching, and occasional crawling and climbing.

- Plaintiff was capable of performing past relevant work as a Nut Sorter thought the date last insured.  This work did not require the performance of work-related activities precluded by her residual functional capacity.

- The claimant was not under a disability, as defined in the Social Security Act, at any time from November 1, 2008, the alleged onset date, through December 31, 2013, the date last insured.

**III.**

**LEGAL STANDARD**

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of

1 | Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

2 | "[A] reviewing court must consider the entire record as a whole and may not affirm
3 | simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting
4 | Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not
5 | this Court's function to second guess the ALJ's conclusions and substitute the court's judgment
6 | for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is
7 | susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be
8 | upheld.").

9 | **IV.**

10 | **DISCUSSION AND ANALYSIS**

11 | Plaintiff argues that the ALJ erred by failing to resolve an apparent conflict between the
12 | VE's testimony and the DOT; making errors regarding Plaintiff's education; failing to provide
13 | legally sufficient reasons to reject Dr. Vesali and Dr. Devireddy's medical opinions; and failing
14 | to provide clear and convincing reasons to find Plaintiff not credible.  Defendant moves for
15 | summary judgment arguing that the ALJ properly relied on the VE's testimony; made no errors
16 | regarding Plaintiff's education; properly evaluated the physician opinions, and properly
17 | evaluated Plaintiff's subjective complaints.

18 | **A.  The ALJ Provided Clear and Convincing Reason for the Credibility Finding**

19 | Plaintiff argues that the ALJ failed to provide clear and convincing reasons to find her not
20 | credible.  Defendant counters that the ALJ properly evaluated Plaintiff's subjective complaints
21 | and found her testimony to not be credible.

22 | "An ALJ is not required to believe every allegation of disabling pain or other non-
23 | exertional impairment."  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation
24 | and citations omitted).  Determining whether a claimant's testimony regarding subjective pain or
25 | symptoms is credible, requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674
26 | F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented
27 | objective medical evidence of an underlying impairment which could reasonably be expected to
28 | produce the pain or other symptoms alleged."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th

1 Cir. 2007) (internal punctuation and citations omitted).  This does not require the claimant to
2 show that her impairment could be expected to cause the severity of the symptoms that are
3 alleged, but only that it reasonably could have caused some degree of symptoms.  Smolen, 80
4 F.3d at 1282.

5       Second, if the first test is met and there is no evidence of malingering, the ALJ can only
6 reject the claimant's testimony regarding the severity of her symptoms by offering "clear and
7 convincing reasons" for the adverse credibility finding.  Carmickle v. Commissioner of Social
8 Security, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ must specifically make findings that
9 support this conclusion and the findings must be sufficiently specific to allow a reviewing court
10 to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not
11 arbitrarily discredit the claimant's testimony.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir.
12 2004) (internal punctuation and citations omitted).  Factors that may be considered in assessing a
13 claimant's subjective pain and symptom testimony include the claimant's daily activities; the
14 location, duration, intensity and frequency of the pain or symptoms; factors that cause or
15 aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other
16 measures or treatment used for relief; functional restrictions; and other relevant factors.
17 Lingenfelter, at 1040; Thomas, 278 F.3d at 958.  In assessing the claimant's credibility, the ALJ
18 may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's
19 reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony
20 by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained
21 failure to seek treatment or to follow a prescribed course of treatment. . . ."  Tommasetti v.
22 Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

23       Plaintiff argues that the ALJ did not identify any specific statement that Ms. Alvarez
24 stated that was inconsistent with her daily activities and therefore the finding is unreviewable.
25 However, the Court finds that the ALJ provided reasons for the credibility finding which are
26 reviewable.  There are two ways for an ALJ to "use daily activities to form the basis of an
27 adverse credibility determination: if the claimant's activity contradicts his testimony or if the
28 claimant's activity meets the threshold for transferable work skills."  Phillips v. Colvin, 61

F.Supp.3d 925, 944 (N.D. Cal. 2014).

Here, the ALJ found that Plaintiff described daily activities that are not as limited as one would expect given her complaints of disabling pain and limitations.  (AR 25.)  Plaintiff stated that she is unable to stand, walk, or sit.  (AR 22, 337-338.)  Yet, Plaintiff testified that she was able to wash dishes, shop for groceries, attend church, visit with friends, watch television, attend her children's athletic events, and care for pet birds.  (AR 25, 56, 57, 58.)  Further, the ALJ found that Plaintiff had cared for foster children since 2008 and had cared for a five year-old foster child until four days before the January 14, 2014 hearing, including helping him change his clothing, which is evidence that she has more functional ability than she alleges and this weakens her credibility.  (AR 19, 25, 60, 295-298, 307-310, 327, 329-330.)

The Court finds that the ALJ provided clear and convincing reasons to find that Plaintiff had more functional ability than she alleged thus weakening her credibility which are supported by substantial evidence in the record.

**B.** **The ALJ Provided Specific and Legitimate Reasons to Reject Dr. Devireddy's Opinion**

Plaintiff contends that the ALJ erred by failing to adopt the opinion of her treating physician, Dr. Devireddy, which was more restrictive than the limitations adopted by the ALJ. Defendant argues that the ALJ properly found that Dr. Devireddy's opinion was not supported by her treatment records and was inconsistent with the medical evidence as a whole.

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).  In general a treating physician's opinion is entitled to greater weight than that of a nontreating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual."  Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (citations omitted).  If a treating physician's opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record.  Ryan v. Commissioner of Social Sec., 528 F.3d 1194, 1198 (9th Cir.) (quoting Bayless v. Barnhart, 427 F.3d 1121, 1216 (9th Cir. 2005)).

Where the treating physician's opinion is contradicted by the opinion of an examining physician who based the opinion upon independent clinical findings that differ from those of the treating physician, the nontreating source itself may be substance evidence, and the ALJ is to resolve the conflict.  Andrews, 53 F.3d at 1041.  However, if the nontreating physician's opinion is based upon clinical findings considered by the treating physician, the ALJ must give specific and legitimate reasons for rejecting the treating physician's opinion that are based on substantial evidence in the record.  Andrews, 53 F.3d at 1041.

Here, there are contradictory opinions in the record so the ALJ is to determine credibility and resolve any conflicts.  Batson, 359 F.3d at 1195.  In order to reject Dr. Devireddy's opinion the ALJ must set forth legitimate and specific reasons.  In addressing Dr. Devireddy's opinion, the ALJ found,

> On September 21, 2010 and December 9, 2013, treating physician Katihikeya Devireddy, M.D. completed Physician Medical Source Statements and opined the claimant was unable to perform work activity even at the sedentary level (Exhibits 11F, pp. 4-7; 22F, pp. 2-6).  I give Dr. Devireddy's opinions limited weight because they are overly restrictive using the objective findings she based her opinions upon and they are inconsistent with the medical evidence as a whole. For instance, her medical reports showed the claimant's objective findings were generally normal (Exhibits 15F, pp. 3-31; 19F, pp. 6-21). In addition, diagnostic images showed some degenerative changes, but there was no nerve root impingement. Moreover, symptoms, such as pain, fatigue, or weakness will not be found to affect a person's ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present (20 CFR 404.1529(b). Because Dr. Devireddy does not support her opinions with diagnostic findings or objective evidence to support the level of pain alleged, I do not accept her opinion with regard to the claimant's residual functional capacity.

(AR 24-25.)

1.    Dr. Devireddy's Objective Findings Do Not Support the Stated Limitations

Dr. Devireddy's examination notes from March 3, 2009 through September 16, 2011, demonstrate generally normal physical examinations.  (AR 584, 585, 586, 587, 588, 589, 919, 920, 921, 922, 923, 924, 925, 928, 929, 930, 931, 932, 934, 935, 936, 937, 938, 939.)

The first objective findings of neck pain and limited movement in right arm in Dr. Devireddy's notes is on August 22, 2011.  (AR 918.)  Plaintiff had an otherwise normal

examination.  (AR 918.)  On this same date, Dr. Devireddy filed a medical source statement.[2]

Dr. Devireddy listed Plaintiff's symptoms as headache, dizziness, neck pain, back pain,

numbness right side of face.  (AR 803.)  The clinical findings and objective signs identified were

movements in neck and upper back are painful and twitching of right side of face.  (AR 803.)

Vicodin made Plaintiff drowsy.  (AR 803.)  Plaintiff's impairments had or could be expected to

last at least 12 months.[3]  (AR 803.)

Dr. Devireddy opined that Plaintiff could sit for 15 minutes at one time; stand for 15

minutes at one time before needing to get up.  (AR 804.)  Plaintiff was able to sit less than two

hours and stand/walk less than two hours in an eight hour workday.  (AR 804)  During an eight

hour workday, Plaintiff would need to walk every fifteen minutes for three to four minutes.  (AR

805.)  Plaintiff would need a job that allows her to shift from sitting, standing, or walking due to

pain, paresthesia, adverse effects of medication, muscle weakness, and chronic fatigue.  (AR

805.)  Plaintiff would need unscheduled breaks every fifteen minutes for ten minutes before she

could return to work.  (AR 805.)  Plaintiff could never lift or carry less than 10 pounds and rarely

carry 10, 20, or 50 pounds.  (AR 805.)  Plaintiff could occasionally look down, rarely turn her

head to the right or left, look up or hold head in a static position, twist, bend/stoop, crouch/squat,

climb ladders or stairs.  (AR 805-806.)

Plaintiff had significant limitations reaching, handling, or fingering.  (AR 806.)  During

an 8 hour work day, Plaintiff could grasp, turn or twist objects 10 percent of the time with her

right hand and 20 percent of the time with her left; she can do fine manipulations 10 percent of

the time with her right hand and 20 percent with the left; and can reach, including overhead, 5

percent of the time with her right arm and 20 percent of the time with her left arm.  (AR 806.)

Plaintiff's impairments are likely to produce good and bad days.  (AR 806.)  Plaintiff would be

absent about one day per month due to her impairments or treatment.  (AR 806.)  The earliest

---

[2] The ALJ stated the ALJ completed the statement on September 21, 2010, however this was the date that the
limitations were stated to have begun.  (AR 806.)

[3] While Plaintiff argues findings relevant to Dr. Devireddy's psychological limitations, the Court does not address
the psychological findings since Plaintiff has not challenged the finding that Plaintiff did not have a severe mental
impairment.  Further, the ALJ relied on the opinion of two consultative examiners which is significant evidence to
support the finding that Plaintiff did not have a severe mental impairment.  (AR 20-21, 597-600, 957-962.)

1    date these limitations apply is September 21, 2010.  (AR 806.)

2    Plaintiff had a normal examination on September 16, 2011.  (AR 917.)  Plaintiff was

3    found to have painful neck with limited movement on September 21, 2011; October 19, 2011,

4    and November 2, 2011.  (AR 913, 914, 915, 916.)  Plaintiff had a normal examination except for

5    her throat and ears on December 5, 2011.  (AR 912.)  On December 23, 2011, the record shows

6    movement of the neck is painful.  (AR 911.)  On January 24, 2012, Plaintiff had tenderness all

7    over her body, mainly to the spine area.  (AR 1027.)  Plaintiff had a normal examination on

8    February 8, 2012.  (AR 1026.)  On March 21, 2012, Plaintiff's examination was normal except

9    for some erythema.  (AR 1025.)

10    On May 3, 2012, Plaintiff was seen complaining of back pain radiating to the buttocks.

11    (AR 1023.)  Plaintiff had normal tone and motor strength.  (AR 1024.)  She had no contractures

12    or bony abnormalities and normal movement of all extremities and tenderness; movements of

13    lower back were painful and limited with pain radiating down legs.  (AR 1024.)  Examination of

14    the extremities showed no cyanosis, edema, varicosities, or palpable cord.  (AR 1024)

15    On June 13, 2012, Plaintiff was seen complaining of headaches and neck pain that

16    radiated to her shoulders.  (AR 1021.)  Plaintiff reported muscle aches and arthralgia/joint pain

17    but no muscle weakness, no back pain, and no swelling of extremities, and no arm pain on

18    exertion.  (AR 1021.)  Plaintiff was in moderate distress and was ambulating normally.  (AR

19    1021.)  Plaintiff had normal tone and motor strength.  (AR 1021.)  Plaintiff had no contractures,

20    malalignment, tenderness or bony abnormalities, and normal movement of all extremities.  (AR

21    1021.)  Movements of neck were painful and limited.  (AR 1021.)

22    Plaintiff was seen on June 26, 2012, complaining of neck pain that radiated down both

23    shoulders and arms.  (AR 1018.)  Plaintiff reported no muscle aches, no muscle weakness, no

24    arthralgia/joint pain, no back pain and no swelling in the extremities.  (AR 1018).  Plaintiff was

25    in moderate distress, and was ambulating normally.  (AR 1019.)  Plaintiff had neck pain with

26    motion.  (AR 1019.)  She had normal tone and motor strength.  (AR 1019.)  There were no

27    contractures, malalignment, tenderness or bony abnormalities, and normal movement of all

28    extremities.  (AR 1019.)  Movements of neck were painful and limited.  (AR 1019.)

1    Plaintiff was seen on July 13, 2012, and was ambulating normally.  (AR 1016.)  Plaintiff

2    had normal tone and motor strength.   (AR 1016.)   Examination found no contractures,

3    malalignment, tenderness, or bony abnormalities and limited ROM; movements of neck are

4    painful and limited with pain radiating to both shoulders. (AR 1016.)   Examination of the

5    extremities showed no cyanosis, edema, varicosities, or palpable cord.  (AR 1016.)

6    Plaintiff was seen on August 21, 2012 having fallen five days prior when her knee

7    buckled.  (AR 1013)  Plaintiff was ambulating normally.  (AR 1014.)  Plaintiff's gait was not

8    antalgic with no pes planus.  (AR 1014.)  Glut medius strength was /5 bilateral.  (AR 1014.)

9    Plaintiff had full range of motion in her hips without pain.  (AR 1014.)  No FADIR, no FABER,

10   no tenderness over greater trochanter area.  (AR 1014.)   Hip flexor strength was 5/5, and

11   extensor was 5/5.  (AR 1014.)  Plaintiff had no pain with resisted hip adduction.  (AR 1014.)

12   Bilateral knee examination was done for comparison.  (AR 1014.)  Plaintiff was diagnosed with

13   an MCL sprain.  (AR 1014.)

14   Plaintiff was seen on March 13, 2013; September 18, 2013; and December 9, 2013; but

15   there are no objective findings in the record.  (AR 1072, 1076, 1079.)  On December 9, 2013, Dr.

16   Devireddy completed a second medical source statement.  (AR 1061-1065.)  Dr. Devireddy

17   identified Plaintiff's chronic pain/paresthesia as chronic neck pain and pain radiates to both arms.

18   (AR 1061.)  Plaintiff's symptoms were tenderness, muscle weakness, chronic fatigue, sensory

19   changes, impaired sleep, and reduced grip strength.  (AR 1061.)  Plaintiff had no significant

20   limitation of motion.   (AR 1061.)   Plaintiff gets persistent headaches.   (AR 1061.)   The

21   symptoms associated with the headaches were malaise, inability to concentrate, impaired sleep,

22   exhaustion, mood changes.  (AR 1062.)  Plaintiff had headaches three times per week that last

23   two hours and thirty minutes.  (AR 1062.)  Plaintiff had nausea and dizziness due to treatment.

24   (AR 1062.)  Plaintiff is not a malingerer.  (AR 1062.)

25   Dr. Devireddy opined that Plaintiff could walk 1 block, sit 20 minutes, and stand 15

26   minutes.  (AR 1063.)  In a total workday, Plaintiff could sit, stand, and walk one hour each, and

27   would need to walk for 10 minutes every 15 minutes in an 8 hour workday.  (AR 1063.)  Plaintiff

28   would need to be permitted to shift positions due to pain, paresthesia, muscle weakness and

chronic fatigue.  (AR 1063.)  Plaintiff would need an unscheduled 15 minute break every 30 minutes in an 8 hour workday.  (AR 1063.)  Plaintiff did not need to elevate legs or use an assistive device.  (AR 1063.)

Plaintiff could never lift 20 or 30 pounds, could occasionally look down or turn head, and rarely look up or hold head in static position.  (AR 1064.)  Plaintiff could rarely twist, stoop, crouch/squat, climb ladders or stairs. (AR 1064.)  Plaintiff had significant reaching handling and fingering limitations; and could grasp, turn or twist objects 20 percent bilaterally; perform fine manipulation 30 percent bilaterally; and reach 30 percent right and 50 percent left.  (AR 1064.) Plaintiff's condition would be likely to produce good and bad days.  (AR 1064.)  Plaintiff was likely to be absent more than 4 days per month due to impairments or treatment.  (AR 1065.) Plaintiff's limitations identified began in 2009.  (AR 1065.)

Review of the record demonstrates that substantial evidence supports the ALJ's finding that Dr. Devireddy's medical reports showed the Plaintiff's objective findings were generally normal and Dr. Devireddy's opinion was not supported with diagnostic findings or objective evidence to support the level of impairment alleged.  The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings.  <u>Thomas</u>, 278 F.3d at 957.[4]

2.      <u>The Opinions of the Agency Physicians are Substantial Evidence to Reject Dr. Devireddy's Opinion</u>

The ALJ gave great weight to the State Agency physician's opinion because the weight of the medical evidence supported them.  (AR 24.).  The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is

---

[4] Plaintiff argues that Dr. Devireddy's opinion is entitled to controlling weight, however, where the ALJ finds that "a treating source's medical opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," it will be given controlling weight.  20 C.F.R. § 404.1527(c)(2). Here, the ALJ found that Dr. Devireddy's opinion was not well supported and there was other substantial evidence in the record that was inconsistent.  Accordingly, Dr. Devireddy's opinion was not entitled to controlling weight. Further, while Plaintiff argues that other evidence in the record support's Dr. Devireddy's opinion, it is for the ALJ to resolve the conflicts in the record, and the ALJ's opinion will be upheld where evidence is subject to more than one rational interpretation.  <u>Burch</u>, 400 F.3d at 679.

1   consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144,

2   1149 (9th Cir. 2001).

3       State agency physical medical consultant, Robert Estes, M.D., reviewed the medical

4   records on April 23, 2012, and opined that Plaintiff could lift and carry 20 pounds occasionally,

5   10 pounds frequently, stand and walk 6 hours cumulatively, and sit 6 hours total in an 8-hour

6   workday with normal breaks. (AR 24, 86.)  Dr. Estes also opined that Plaintiff was limited to

7   frequent pushing and pulling and overhead reaching with the right upper extremity.  (AR 24, 86.)

8   Dr. Estes found that Plaintiff was limited to frequent balancing, stooping, kneeling, crouching,

9   and crawling as well as occasional climbing.  (AR 24, 86-87.)  P. Frye, M.D., another State

10  agency physical medical consultant, reviewed the medical records on January 4, 2013, and

11  provided a similar opinion.  (AR 24, 122-123.)

12      Dr. Estes found that Plaintiff "exhibited minimal evidence of any physical deficit.  Pain is

13  exaggerated, visual loss alleged with no objective evidence to support same, and imaging the

14  only objective evidence suggesting cervical and lumbar spine degenerative disease.  Evidence of

15  weakness is underwhelming, concluding aside from pain claimant probably does not demonstrate

16  a significant functional loss." (AR 87.)  Further, Dr. Estes stated that "[t]his assessment may be

17  generous but is believed to be appropriate as written."  (AR 87.)

18      Dr. Frye reviewed the record on reconsideration and found that the consultative examiner

19  gave a clearer picture of Plaintiff's overall capability, but giving her the benefit of the doubt she

20  would be reduced to light with postural and some manipulative limitations.  (AR 122.)  Dr. Frye

21  affirmed the residual functional capacity assessment of Dr. Estes.  (AR 125-126.)

22      These opinions also constitute substantial evidence to reject the opinion of Dr. Devireddy

23  as they are consistent with, but more restrictive than, the opinion of Dr. Vesali which is

24  discussed below.

25      **C.    The ALJ Did Not Provide Reasons to Reject Dr. Vesali's Fingering
             Limitations**

26

27      Plaintiff argues that substantial evidence does not support the residual functional capacity

28  assessment or step four decision because the ALJ did not give legally sufficient reasons for

1   implicitly rejecting the consultative examiner's December 2012 opinion that Plaintiff could

2   perform frequent manipulations with the right hand.  Defendant counters that the ALJ properly

3   evaluated Dr. Vesali's opinion and limited Plaintiff to occasional overhead reaching.  Further,

4   Defendant contends that even if the ALJ erred by not including frequent fingering as a limitation

5   the error would be harmless because the ALJ identified other jobs that Plaintiff could perform

6   with such a limitation.

7          The ALJ considered the December 13, 2012 consultative examination findings of Fariba

8   Vesali, M.D., who performed a comprehensive orthopedic evaluation by reviewing the record

9   and examining Plaintiff.  (AR 24, 1036-1039.)  Plaintiff told Dr. Vesali that her chief complaints

10  were neck pain, low back pain, and right arm pain.  (AR 24, 1036.)  Dr. Vesali noted that

11  Plaintiff had no difficulties taking off her shoes and putting them back on.  (AR 1036.)  She was

12  able to pick up a paperclip off the desk with her right hand, but asked for help taking off her

13  sweater due to right arm pain.  (AR 1036.)  She held onto the wall and walked on her heels and

14  toes but did not have an assistive device.  (AR 1036.)

15         The physical examination showed normal ranges of motion of all extremities and joints

16  except for slight decrease in the lumbar spine and right shoulder.  (AR 24, 1037-1038.)  There

17  were negative straight leg raising tests bilaterally in the seated position, but positive in the supine

18  position.  (AR 24, 1037.)  Plaintiff had a normal gait, normal motor strength, some decreased

19  sensation in the right upper and right lower extremity and normal reflexes.  (AR 24, 1036-1037-

20  1038.)  Plaintiff had had tenderness with superficial palpation of the right upper extremity and

21  entire upper, mid, and lower back.  (AR 24, 1037.)  It was also noted that axial compression

22  exacerbated the back pain and rotation of the trunk was positive.  (AR 24, 1038.)

23         Dr. Vesali opined that Plaintiff should be able to walk, stand, and sit six hours in an

24  eight-hour day with normal breaks; did not need an assistive device for ambulation; should be

25  able to lift and carry 50 pounds occasionally, 25 pounds frequently; should be able to do frequent

26  postural activities; should be able to do manipulative activities with the left hand with no

27  limitations; and should be able to do occasional overhead activities with the right hand,

28  otherwise frequent manipulative activities with the right hand.  (AR 1039.)

The ALJ found that:

> Dr. Vesali opined the claimant could perform work activity at the medium exertional level with frequent postural activities.  He also opined she could perform occasional overhead activities with the right hand, otherwise frequent manipulative activities with the right hand.  I give Dr. Vesali's opinion limited weight because it is not restrictive enough and I find it is appropriate to limit the claimant's exertional activity to light work activity due to decreased ranges of motion in the right shoulder and decreased sensation of the right upper and lower extremities.

(AR 24.)

While recognizing that Dr. Vesali found that Plaintiff was limited to frequent manipulative activities with the right hand, which was due to decreased sensation in the right upper extremity, the ALJ did not include the limitation or provide any reason to reject the limitation.  The Court finds that the ALJ erred by failing to provide any reason to reject Dr. Vesali's limitation of frequent fingering.

**D.     The Action Shall be Remanded for Further Administrative Proceedings**

While Defendant argues that any error in including the frequent fingering requirement is harmless, Plaintiff argues that the ALJ made this error and several other errors at steps four and five.

1.     Frequent Fingering Limitation

First, Plaintiff argues that the VE testified that the job of nut sorter requires constant fingering in conflict with the DOT which states that it would require frequent fingering.  Defendant cites to no authority in support of the position that the ALJ can rely on the DOT description because it is an acceptable vocational source once the VE has identified a conflict.  Therefore, the Court finds that there is not substantial evidence in the record to support the finding that Plaintiff can perform her prior work as a nut sorter.

2.     Occasional Overhead Reaching Limitation

Defendant contends that, even if the ALJ erred in finding that Plaintiff can perform her prior work, the ALJ identified alternative jobs that Plaintiff could perform which only require occasional fingering.  Plaintiff counters that the other jobs identified by the VE all require frequent reaching; and therefore, the DOT conflicts with Plaintiff's ability to only occasionally

1   reach overhead.  Defendant replies that since Plaintiff is only limited in overhead reaching with

2   her right arm the Court should find no conflict with the DOT.

3        The DOT does not address overhead reaching, but provides the requirement for reaching

4   in general.  (See Dictionary of Occupational Titles, 641.687-014 Box-Sealing Inspector,

5   739.687-194 Vacuum-Bottle Assembler, 920.687-042 Bottling-Line Attendant, ECF No. 14-2.)

6   The Ninth Circuit recently addressed this issue regarding when an overhead reaching limitation

7   conflicts with the DOT in Gutierrez v. Colvin, 844 F.3d 804 (9th Cir. 2016).  In Gutierrez, the

8   plaintiff was arguing that the ALJ's finding that she was able to work as a cashier conflicted with

9   the DOT's frequent reaching requirement because she could not lift her right arm above the

10  shoulder.  Id. at 807.  The Ninth Circuit held that an ALJ only need to follow up on those

11  conflicts that are obvious or apparent.  Id. at 807-808.  In order to be in conflict with the DOT

12  the testimony must be at odds with the "job requirements that are essential, integral, or

13  expected."  Id. at 808.  Since the DOT addresses a large category of occupations that would fall

14  with a particular listing, the ALJ need not address conflicts that are not essential, integral, or

15  expected parts of the job, and where a job itself is a familiar one less scrutiny is required.  Id.  In

16  the case of a cashier, the Ninth Circuit found that it is uncommon for a cashier to reach overhead

17  and therefore there was no apparent or obvious conflict with the DOT.  Id.

18       If this was the only error raised by Plaintiff, the Court would address the specific

19  occupations identified and whether there was an apparent conflict.  However, as discussed

20  below, the Court finds that the ALJ also erred in failing to address Plaintiff's literacy.  Therefore

21  on remand, the ALJ should address the reaching limitations for any job identified by the VE if

22  the reaching requirements would be apparent or in obvious conflict with the DOT.

23       3.   Plaintiff's Illiteracy in English

24       Additionally, Plaintiff argues that the ALJ erred in failing to address Plaintiff's illiteracy

25  in English.  The Ninth Circuit has held "only literacy in English is considered, since literacy in

26  other languages has little effect on the number of jobs in the national economy available to the

27  claimant.  20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5).  'Illiterate' therefore means illiterate in

28  English."  Chavez v. Dep't of Health and Human Services, 103 F.3d 849, 852 (9th Cir. 1996);

1  see also Silveira v. Apfel, 204 F.3d 1257, 1261 (9th Cir. 2000) (illiteracy is the inability to read

2  or write in English).  However, "[w]hile illiteracy or the inability to communicate in English may

3  significantly limit an individual's vocational scope, the primary work functions in the bulk of

4  unskilled work relate to working with things (rather than with data or people) and in these work

5  functions at the unskilled level, literacy or ability to communicate in English has the least

6  significance." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(I)  "Thus, the functional capability

7  for a full range of sedentary work represents sufficient numbers of jobs to indicate substantial

8  vocational scope for those individuals age 18–44 even if they are illiterate or unable to

9  communicate in English."  Id.

10       In Pinto v. Massanari, 249 F.3d 840 (9th Cir. 2001), the ALJ found that the claimant was

11  able to perform her past job duties which required a Language Level 2, although she was

12  illiterate in English.  Pinto, 249 F.3d at 847.  The Ninth Circuit reversed in part because in order

13  for an ALJ to rely on a job description in the DOT that fails to comport with a claimant's noted

14  limitations, the ALJ must definitively explain this deviation.  Id.  Neither the ALJ nor the VE had

15  addressed the impact of the claimant's illiteracy on her ability to find and perform a similar job.

16  Id.

17       In this instance, Plaintiff's attorney addressed her illiteracy in English in his hypothetical

18  to the VE.  However, the hypothetical presented was significantly more restrictive than

19  Plaintiff's residual functional capacity.  Defendant argues that the ALJ provided an alternate

20  finding of jobs which Plaintiff could perform which would encompass the limitation of frequent

21  fingering with the right hand, however, the ALJ did not inquire if Plaintiff's illiteracy in English

22  would impact her ability to find and perform these jobs.  Accordingly, on remand, the ALJ shall

23  inquire into how Plaintiff's illiteracy in English will impact her ability to find and perform any

24  jobs which the VE opines that she could perform.

25       4.    Remand for Further Administrative Proceedings

26       Plaintiff seeks a remand for benefits, or alternately a remand for further administrative

27  proceedings.  Defendant contends that remand for benefits is not appropriate.  The ordinary

28  remand rule provides that when "the record before the agency does not support the agency

1    action, ... the agency has not considered all relevant factors, or ... the reviewing court simply

2    cannot evaluate the challenged agency action on the basis of the record before it, the proper

3    course, except in rare circumstances, is to remand to the agency for additional investigation or

4    explanation." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014).

5    This applies equally in Social Security cases. Treichler, 775 F.3d at 1099.

6         Under the Social Security Act "courts are empowered to affirm, modify, or reverse a

7    decision by the Commissioner '*with or without* remanding the cause for a rehearing.' " Garrison

8    v. Colvin, 759 F.3d 995, 1019 (9th Cir. 2014) (emphasis in original) (quoting 42 U.S.C. §

9    405(g)). The decision to remand for benefits is discretionary. Treichler, 775 F.3d at 1100. In

10   Social Security cases, courts generally remand with instructions to calculate and award benefits

11   when it is clear from the record that the claimant is entitled to benefits. Garrison, 759 F.3d at

12   1019.

13        In this instance, it is not clear that Plaintiff would be entitled to benefits as there is no

14   evidence in the record regarding whether the additional limitation of frequent manipulation with

15   the right hand and Plaintiff's illiteracy in English will preclude work activities. Accordingly, this

16   action shall be remanded for further administrative proceedings.

17                                            **V.**

18                              **CONCLUSION AND ORDER**

19        Based on the foregoing, the Court finds that the ALJ did not err in making an adverse

20   credibility finding against Plaintiff or in rejecting the opinion of Dr. Devireddy. However, the

21   ALJ did err in failing to include that Plaintiff was limited to frequent handling with her right

22   hand in her functional capacity assessment, and not addressing conflicts with the DOT. This

23   action is remanded for further proceedings consistent with this opinion.

24        Accordingly, IT IS HEREBY ORDERED that:

25        1.    Plaintiff's appeal from the decision of the Commissioner of Social Security is

26              GRANTED IN PART AND DENIED IN PART;

27        2.    Defendant's motion for summary judgment is GRANTED IN PART AND

28              DENIED IN PART;

3.   The Court REMANDS this action back to the Commissioner for further administrative proceedings consistent with this opinion;

4.   The Clerk of the Court is DIRECTED to enter judgment be entered favor of Plaintiff Luisa Alvarez and against Defendant Commissioner of Social Security; and

5    The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   **February 23, 2017**

UNITED STATES MAGISTRATE JUDGE